### LORRAINE v. TOWNSEND et al.

(Circuit Court of Appeals, Ninth Circuit.   June 4, 1923.   Rehearing Denied July 16, 1923.)

No. 3945.

1. **Patents 157(1)—Meaning given doubtful claims by patentee may aid in their construction.**

A patent is to be interpreted by its own terms, but when on its face it is fairly susceptible of different constructions, resort may be had to the meaning put on it by the patentee while his application was pending.

2. **Patents ⊂⇒328—1,269,134, for oil and gas separator, held infringed.**

The Trumble patent, No. 1,269,134, for oil and gas separator, construed in the light of the prior art and the patentee's interpretation of the claims in the Patent Office, *held* limited to an apparatus by which substantially the whole body of crude oil is spread as a film or thin sheet on a backing wall, and is not in the course of the process of separation broken up by any means into drops or streamlets. As so limited, *held* not infringed by the apparatus of the Lorraine reissue patent, No. 15,220, but infringed by another structure of defendant.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Charles E. Wolverton, Judge.

Suit in equity by Francis M. Townsend and others, doing business under the firm name of the Trumble Gas Trap Company, against David G. Lorraine. Decree for complainants, and defendant appeals. Reversed.

For opinion below, see 283 Fed. 806.

Westall & Wallace, Ernest L. Wallace, and Joseph F. Westall, all of Los Angeles, Cal., for appellant.

Frederick S. Lyon, Leonard S. Lyon, and Frank L. A. Graham, all of Los Angeles, Cal., for appellees.

Before GILBERT and RUDKIN, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge.   The suit involves a consideration of patented inventions, used in connection with oil wells, for separating the constituents of the crude flow from well pipes—generally a frothy mixture of dry gas, light and heavy oil, water, and sand.   Plaintiffs below, appellees here, are the holders of patent No. 1,269,134, issued to Milon J. Trumble, June 11, 1918, upon an application filed November 14, 1914, which they charge is infringed by apparatus the defendant manufactures and sells.   The essence of the invention is supposed to be the conception, in combination, that the most perfect and quickest results may be obtained by applying pressure to a thin, unbroken film of the mixture slowly flowing over the surface of a solid, such, for example, as the interior surface of the wall of the separator tank.   The inventor's theory is that in this way not only will the dry gas be expelled, but the lighter liquid constituents, such as gasoline, will be retained in solution with the heavier oils.   There is no claim to the dis-

covery of the physical law involved; that appears to have been well known. Standard Oil Co. v. Oklahoma (C. C. A.) 284 Fed. 469, 472. As a means the patentee specifies an upright cylindrical tank or chamber within which near the top are mounted cone-shaped spreaders, one below the other, with their peripheries nearly in contact with the walls of the chamber. By a pipe connecting the tank with the well the crude oil or froth is carried into the top of the chamber, and, falling, spreads over the cones, and from them in a thin film or sheet down the walls of the chamber. The gas, rising is discharged through a take-off duct, the oils, including gasoline, through a lower outlet, and the water and sand are drawn off from an opening in the funnel-shaped bottom, all outlets being controlled by appropriate means. In the court below it was held that appellant's separators, conforming in a general way to the specifications of his reissue patent, No. 15,220, of November 8, 1921, infringe the first four claims, which are as follows:

"1. In an oil and gas separator, the combination of an expansion chamber arranged to receive oil and gas in its upper portion, means for spreading the oil over the wall of such chamber to flow downwardly thereover, gas take-off means arranged to take off gas from within the flowing film of oil, an oil collecting chamber below the expansion chamber, an oil outlet from said collecting chamber, and valve-controlled means arranged to maintain a submergence of the oil outlet.

"2. In an oil and gas separator, the combination of an expansion chamber, inlet means arranged to permit the entrance of oil and gas into the chamber, means within the chamber adapted and arranged to distribute the oil over the wall of the chamber in a downwardly flowing film, gas take-off means arranged to take gas from within the envelop of downwardly flowing oil, and means for maintaining gas pressure upon such oil.

"3. In an oil and gas separator, the combination of an expansion chamber having a surface adapted to sustain a flow of oil thereover in a thin body, means for distributing oil onto such surface, pressure maintaining means arranged and adapted to maintain a pressure on one side of the flowing oil, withdrawing means arranged to take gas from the chamber, and means for withdrawing oil from the chamber.

"4. In an oil and gas separator, the combination of an expansion chamber, means for delivering oil and gas into the chamber, means for maintaining pressure within the chamber, means for drawing oil from the chamber, and means within the chamber adapted to cause the oil to flow in a thin body for a distance to enable the gas contained and carried thereby to be given off while the oil is subjected to pressure."

Upon reference to the prior art it is seen that separating devices are numerous and have long been used in the industry; but appellees contend for a broad interpretation of their claims, upon the theory that essentially their invention is of a generic character. And in this contention we have a suggestion of the ultimate and controlling issue of the case. Virtually conceding that in the light of admissions, in the nature of disclaimers, made by Trumble in the course of the patent proceedings, the validity of the patent may be upheld, appellant maintains that this is possible only by giving the claims a very narrow interpretation, in effect limiting them to the specific structure of the drawings and specifications, a structure where the *whole* body of the crude oil is spread *equally* in a *thin film* upon the conical spreader plates and upon the entire chamber wall intermediate between them and the pool level. If so read, it is to be conceded that there is no infringement in at least two of appellant's devices exhibited in the record, the appa-

ratus shown in the drawings of appellant's patent and the modified construction having a bell-shaped delivery nipple.

While appellant employs a similar chamber or compression tank together with the element of pressure in the tank, the crude mixture is introduced with greater force than in the Trumble device, and instead of gravitating evenly over the conical spreaders and from them down the chamber walls, the incoming stream is broken up by the inclined bottom or deflecting plate of the patent model, or the bell-shaped nipple, and in part splashed against the chamber wall and partition, the other part falling free into the settling pool. Some of the portion striking the partition plate and chamber walls doubtless flows down the surfaces to the pool below, and, so flowing in a sort of a sheet, is suggestive of the Trumble process. But the filming is only slight and incidental, and apparently these features of appellant's apparatus are primarily designed to get the requisite exposure for the escape of gas, by dividing the body of the froth into drops and splashes and streamlets, rather than by spreading it as a sheet or film on a solid backing, and also to guard the settling pool against direct discharge into it of the incoming stream at a high velocity, causing violent agitation and interfering with the separation, by gravitation, of the sand and water from the oil.

Admittedly much of the liquid, after being deflected and broken up, falls into the pool by gravity, without contact with either the partition member or the chamber walls, and much of the interior wall space available for film backing, as in the Trumble structure, is not utilized for that purpose; and as to the flaring nipple in one model and the deflecting baffle plate in the other, the superficial area of these members is too small to be suggestive of a film-backing function. Upon the other hand, Trumble makes it clear in his patent proceedings that he strives to spread the incoming mixture of crude oil into a thin flowing body, not agitated, and not broken into particles or drops, and accordingly he not only avails himself of the entire chamber wall, but also of the large surface area of the conical spreader plates, for film backing. In meeting the references cited by the Examiner, Trumble said:

"Applicant has discovered that, in order to maintain the lighter series of oils in combination with the heavier series when separating the gas, it is necessary to reduce the oil to a thin regularly flowing body, which is not subjected to any breaking-up action, and to permit the gas to escape therefrom without agitation."

The question, therefore, is whether, notwithstanding the restrictive interpretation of the patent proceedings, the Trumble claims may still receive a construction broad enough to embrace the appellant's structure, and whether, in view of the prior art, they can be saved from anticipation, if so interpreted. Considering now only the two forms of appellant's device already described, we think the first branch of the question should, and the latter must be, answered in the negative. As we have seen, if under a narrow interpretation we read the Trumble patent only upon separators where pressure is applied to the whole body of the oil, spread in a thin film upon the chamber wall or other backing without "any breaking-up action," it does not reach the appellant's apparatus, for in its operation only a part of the froth ever ap-

proximates the form of a film, and that after the stream has been more or less broken up. If, upon the other hand, we read the claims broadly enough to embrace appellant's devices, interference with prior patents is unavoidable.

How, for example, can we stretch the claims to reach Lorraine and exclude Cooper, to whom patent No. 816,407 was issued March 20, 1906? In the separator disclosed by his drawings (as in the Trumble patent) the compression tank is an upright cylinder, in one side of which, about half way up, is made an inlet opening leading through the wall at an angle whereby the discharge end of the intake pipe is adapted to deliver the stream from the well into the tank tangentially to its circumference. So discharged under pressure, the material is first received upon a "wearing plate" attached to the cylinder wall, and by the momentum is carried along the wall in line with the circumference, the residuum left by contact flowing in a thin sheet down the wall into the oil pool. That the Cooper process was under pressure there can be no doubt. The patentee expressly points out that a high degree of pressure is maintained in his device, by reason of its organic connection with a pressure system, and surely the filming is much more complete than in the appellant's apparatus.

Or suppose we consider the McIntosh device, patented March 11, 1913, No. 1,055,549. Here the oil is introduced into the separator tank, which again is in the form of an upright cylinder, through a pipe entering vertically through the bottom of the tank, with the open discharge end some distance above the level of the oil pool. Attached to this pipe, intermediate the oil level and the discharge end, there is a plurality of flanges extending laterally and slightly inclined downward. Overflowing from the discharge end of the pipe the incoming oil falls upon the upper flange, which has the smallest circumference, and spreading over it in a thin layer thence trickles off the outer edge to a lower flange of larger circumference, etc. "In this manner," as is explained in the patent application, "the liquid flows in thin layers out from the discharge pipe over the succession of flanges, so that it is spread over a series of thin and extended layers, whereby the gas contained therein in the liquid is freed and collected in the gas chamber." We thus see that in this apparatus filming, if not of the entire body of the oil, is given much greater prominence than in the appellant's separator.

It is urged, however, that there is no element of pressure in the combination. True, the term is not used in the patent, but it is thought that the element is necessarily implied. In truth, while a separation without attendant pressure other than atmospheric is conceivable, it is generally speaking a natural incident of the process. Standard Oil Co. v. Oklahoma N. G. Co. (C. C. A.) 284 Fed. 469. Of course, if the gas is to be wasted, it may be permitted to escape into the air from the crude oil held in open tanks, but one of the purposes of separating devices is to save the gas, and, if saved, it must be incarcerated, and incarceration implies pressure. To impound the gas escaping from the mixture the patentee employs the means commonly used in gas plants. The gas chamber is referred to by him as an "inverted bell,"

which is shown in the drawings as telescoping into the open top of the oil or settling chamber, so that the lower edge or rim is submerged in the oil pool; the two units thus forming a single container expanding or contracting by telescopic movement in response to the pressure of incarcerated gas by which the weight of the gas chamber is sustained. It thus appears that in this apparatus there are both pressure and filming.

In the Bray patent, No. 1,014,943, issued June 16, 1912, the expansion chamber is equipped with conical spreaders upon which the froth is received as in the Trumble apparatus. True, these spreaders are perforated, and through the perforations it may be assumed a part of the liquid drops to the pool. But, as was plainly pointed out by the Examiner of the Patent Office, a considerable portion doubtless spreads in a sheet or film over the surface and reaches the walls of the chamber, down which it flows, as in the Trumble device. The element of pressure is not so clearly disclosed, but, as already stated, if the liberated gas is saved, the element of pressure is so inherent that, in the absence of a means to neutralize it, its presence is almost necessarily to be inferred. If, as is to be assumed, the gas is separated for use, it must be conveyed through pipes to the place of use and its delivery controlled, and, as was said by an expert witness called by the appellees, "a pressure could be maintained either by a valve put directly at the trap (separator) or by a valve at the end of the line or perhaps by a contracted opening at the end of the line, which might be an absorbtion plant, or where it is delivered to the boilers, or anywhere." And in this connection it is to be noted as significant that, while in the patent proceedings Trumble experienced great difficulty in meeting the Bray reference, in differentiating the two devices he then said:

"Applicant's invention consists of a containing vessel, an imperforate cone adapted to spread the whole body of the oil to the outer edge of the vessel, and means for taking off the gas from the interior of the cone near the center of the vessel. In the Bray patent there is no means for spreading the oil, and even if the Examiner holds the screens (or perforated cones) 11, 12, and 13 spread a portion of the oil, he cannot avoid the conclusion that oil will pass through a screen and that some oil will not be spread. Moreover, if we adopt the Examiner's viewpoint, and hold that the opinions in the screens are to let the gas through, it is even more evident that the screens of Bray are not equivalent to the imperforate cones of Trumble. Bray put holes in his screens because he had to, to make his apparatus work, whether we consider the gas or the oil as passing through the holes."

It will thus be seen that the differentiation attempted was not upon the ground that the element of pressure was wanting in the Bray patent, but because by that device only a part of the oil was turned into a film; whereas by the Trumble apparatus the whole body of the oil was so affected. If, then, to escape Bray, Trumble urged a construction of his claims by which they were to be limited to devices "adapted to spread the *whole body* of the oil to the outer edge" of the chamber. can he now successfully urge an interpretation which would reach the appellant's device where only a part of the oil is spread to the outer walls, and that in a very different manner? Meeting other references cited in the Patent Office, the applicant there declared that he had found it to be—

"necessary to reduce the oil to a thin regularly flowing body, which is not subjected to any breaking-up action, and to permit the gas to escape therefrom without agitation. All of the references cited would cause a breaking up of the flowing body of oil, or agitation thereof, and result in the carrying away of the light volatile oils with the gas."

[1] This being the limitation put by him upon the breadth of his claims for the purpose of avoiding interference in procuring the patent, how can he now be heard to say that the claims may properly be read upon the appellant's device, where admittedly the oil is agitated and broken up? We are not to be understood as intimating that correspondence between an applicant and the Commissioner of Patents, or statements made in arguendo, can be invoked to add to or vary the language of a patent. A patent, like other written instruments, is to be interpreted by its own terms. But when, upon its face, it is fairly susceptible to different constructions, resort may be had to the meaning put upon it by the patentee while his application was pending.

"[But] when a patent bears on its face a particular construction, inasmuch as the specifications and claim are in the words of the patentee, it is reasonable to hold that such a construction may be confirmed by what the patentee said when he was making his application. The understanding of a party to a contract has always been regarded as of some importance in its interpretation." Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 227 (26 L. Ed. 149).

In this view we do not enlarge, diminish, or vary the language of the patent, but only adopt a construction to which it is fairly susceptible, and which, to induce the allowance of his claims, the applicant urged as his understanding of their true intent and meaning.

[2] Our conclusion is that, in the light of the prior art and the patentee's interpretation of his claims in the Patent Office, the claims are to be read only upon apparatus by which substantially the whole body of oil is spread as a film or thin sheet on a backing wall, and is not, in the course of the process of separation, broken up by any means into drops or streamlets; and, if so read, they do not reach the structure exhibited in the drawings of appellant's patent or in the model identified by the bell-shaped discharge nipple. But it is further thought that, so interpreted, they do cover the construction of what is referred to in the record as Towner No. 3 trap, and apparently designated in the decision of the court below as model No. 1. This device, the court found, has—

"an inner partition set away from the wall on one side more than one-third the distance of the diameter of the chamber and extending below the oil level. To this partition, at some distance from the top of the chamber, is attached a baffle plate extending downward on an incline of perhaps 45 degrees, and to within one inch and a half to two inches from the wall for the entire segment cut off by the partition. The oil inlet, consisting of a pipe, extends downward to within a short distance of the baffle plate. The plate has two openings, so that the stream of oil is divided and projected upon the baffle plate in two directions, laterally."

Possibly, as contended by appellant, the partition is less instead of more than one-third of the distance from the wall; but the precise location is not highly material. The baffle plate is thought to be the equivalent of the Trumble cone, and spreads approximately the whole

body of the oil in an unbroken condition to the adjacent segment of the chamber wall, down which it flows substantially as in the Trumble device.

Accordingly the interlocutory decree is reversed, with directions to enter a decree interpreting the Trumble patent in harmony with the views herein expressed, and enjoining defendant from manufacturing, selling, or using any device infringing the same, and particularly the construction of the Towner No. 3 trap as hereinbefore described.