LORRAINE et al. v. TOWNSEND et al.

(District Court, S. D. California, S. D. December 20, 1924.)

No. F-80.

1. **Evidence** ⚖➜8—**It is common knowledge that gas is generally an accompaniment in the production of oil from wells.**

It is common knowledge that, in the production of oil from wells sunk into the ground, there is generally an accompaniment of gas.

2. **Patents** ⚖➜328—**Lorraine patent, No. 1,373,664, and reissue No. 15,220, claims 17, 18 and 19, held not infringed.**

Lorraine patent, No. 1,373,664, and reissue No. 15,220, claims 17, 18, and 19, covering de-

vice for separation of gas from oil delivered from producing well, *held* not infringed by device manufactured under Trumble patent, No. 1,269,134.

In Equity. Suit by David G. Lorraine and others against Francis M. Townsend and others. Decree for defendants.

See, also, 283 F. 806.

Westall & Wallace, of Los Angeles, Cal., for plaintiffs.

Lyon & Lyon and Frank L. A. Graham, all of Los Angeles, Cal., for defendants.

JAMES, District Judge. Plaintiffs allege infringement of claims 17, 18, and 19 of patent No. 1,373,664, issued April 5, 1921, and reissue No. 15,220, of November 8, 1921. The patent covers a device or mechanical contrivance by which gas may be separated from oil delivered from a producing well. Defendants have such a device, which they claim is protected by patent No. 1,269,134, dated June 11, 1918, issued to M. J. Trumble. Plaintiffs contend that a form of the defendants' device, differing from that described in the Trumble patent, is being manufactured by defendants, and that it is an infringement.

[1] It is now a matter of common knowledge that in the production of oil from wells sunk into the ground there is generally an accompaniment of gas. This gas, if not collected by some means, will escape into the air and be lost. Various methods had for many years, long prior to the date of the patent of either the plaintiffs or the defendants, been employed for the purpose of collecting the gas and retaining it in some receptacle under pressure, from which receptacle it might be conducted by pipes and used for heating or illumination. It is a matter of quite common knowledge that oil producers early used the well casing as a container, employing a packer around the pumping tube to prevent the escape of the gas, and then conducting it through pipes to boilers and for other uses.

In view of the well-known practices in that regard at the time the plaintiffs and defendants brought their devices forward, there was no novelty at all in the mere construction of a metal reservoir into which both the oil and gas, emitted from a well, would be delivered; the gas being collected in the upper portion of the chamber, and the oil collecting and passing out from the lower portion thereof. It was determined, however, that in addition to the free gas emerging from a well the oil itself contained such highly volatile constituents as

would show a tendency to vaporize more or less freely under varying conditions, dependent upon the manipulation thereof. It is well known that the transformation of such constituents is heightened by the application of heat and the releasing of pressure. Gasoline producers have reversed the process, and have taken natural gas from oil wells, subjected it to high pressure, reduced its temperature by refrigeration, and, as a result, precipitated it in the form of gasoline.

[2] In the field of invention entered by the plaintiffs and defendants, the main problem was to increase the volume of gas produced by a well, by both saving and collecting the gas that came in clear form from the well and stimulating the separation of more gas from the liquid petroleum. The latter result, so far as it was accomplished by either the device of the plaintiffs or that of the defendants, depended upon the manner in which the oil and gas entered the receptacle from the well, and the manner *in which the oil was held and distributed* inside such receptacle. Heat was designed to be applied through a steam coil by Trumble, but it was not a part of the plaintiffs' apparatus; hence the presence or lack of heating appliance is not a question here.

Bray, as described in patent No. 1,014,943, dated January 16, 1912, had designed a gas trap, which consisted of a large metallic container, the equivalent, so far as the general idea of a container is concerned, to that found in both the plaintiffs' and the Trumble patents. Bray distributed the incoming oil over perforated conical plates installed in the upper part of his container, there being three in number, one underneath the other. He seems to have considered that it was desirable to break up the oil as an aid to the separation of the gas, and for that purpose perforated his conical sections, so as to permit the dripping of the fluid. The Bray patent was cited in a suit between the same parties as here appear, *wherein it was contended by these defendants that their patent had been infringed* in certain of its claims by the device manufactured under Lorraine's reissue. See Lorraine (appellant) v. Townsend et al. (C. C. A.) 290 F. 54.

A reading of that decision, with the citations made in it, shows that the court considered the inventive field a narrow one. Lorraine included in his device two features different from those which had preceded him, in that he fed his oil and gas mixture into a chamber built within the main con-

tainer, walling this chamber off, and attaching it to one side of the inclosing cylinder. The inner chamber opened into the main inner receptacle at the top, the lower end of its inner wall being designed to be kept submerged in the oil contained in the main receptacle. He applied, too, a synchronized valve connection attachment of his own invention, the valve being placed outside the receptacle. As the float within the chamber rose or fell with the liquid surface of the oil contained therein, the oil outlet would open or close, and the gas outlet would operate in the reverse. A feature of the device of both parties was to increase the gas pressure in the upper part of the chamber as the liquid contents ascended, one function of this pressure being to expel the oil more rapidly. That feature was not new. It was used by Bray before it had been used by either of these parties, as well as Cooper in 1916. The synchronized valve as a separate thing, it seems to be conceded, is entitled to a claim for originality, but it is not made use of in the Trumble apparatus.

Because the owners of the Trumble patent, at a date subsequent to the issuance of the Lorraine patent, cut out the lower baffle plates and adjusted their float, so that a higher level of oil might be maintained within the cylinder, Lorraine insists that infringement has resulted. He claims equivalency for his segmented chamber in the additional space provided by the cutting out of the Lorraine baffles. He claims that the raising of the oil level to a mean height within the container adopts his inventive idea. In view of what has been said regarding the state of the art in this field, it is plain enough that, so far as arrangement of the interior chamber is concerned, without his segmented compartment Lorraine's device would disclose no originality. The addition of his compartment, as is true also of the baffle plates of Trumble, marks but a small advance over devices well known and in prior use. This first claim of Lorraine's, therefore, should be dismissed as without merit.

If the second claim—that the raising of the height of the oil in the receiving chamber worked such a great improvement in gas traps as to indicate inventive novelty—is upheld, that conclusion must be declared in the face of the fact that neither singly nor collectively are any different adjuncts required in raising the oil level than at all times have been parts of the Trumble assemblage. In operating the trap, the liquid is required to be drawn off through an aperture at the bottom or side of the receptacle. The float in the inner chamber, operating upon the outlet valve, opens or closes it as the liquid rises or falls. This feature is common to Trumble, Lorraine, and other preceding patents. The gas is carried out at the top or roof of the receptacle; but, if the fall of the liquid is so great as that the level reaches the line of the outlet, the gas will blow out and mingle with the oil until the liquid level again rises to seal it. To guard against the latter contingency, the common expedient which would occur to the mind of any intelligent observer would be to raise the oil level by arranging the float device so that the oil outlet valve would close before the fluid level fell far enough to allow the gas to blow out. It can easily be seen that the second claim of Lorraine involves only a matter of adjustment, and not of novelty of device; and it was clearly shown by the evidence that the most successful operation of a gas trap, as to the particular last discussed, does not depend upon the oil being carried at about the middle of the receptacle, or at any particular or specific height. In its practical working the height of the receptacle may be extended, and leave the oil level far below the middle line. And this is equally true of either the Lorraine or Trumble device.

I have not considered it necessary to enter into a discussion of the functions of the segmented chamber of Lorraine, as compared with the baffle plates of Trumble. The feature of pressure maintained within the chamber is common to both, and not a matter involving a new idea. This is plainly pointed out in Lorraine v. Townsend, supra. Within the narrow limits left by a very much occupied field, I think that the segmented chamber and its arrangement in connection with the gas separation device is the only thing, aside from the synchronized valve, that may be said to entitle the Lorraine patent to a claim of validity. I find that the charge of infringement is not sustained.

The decree will therefore be for the defendants, and will include costs in their favor.