## STANDARD OIL CO. et al. v. OKLAHOMA NATURAL GAS CO.

(Circuit Court of Appeals, Eighth Circuit. October 2, 1922.)

### No. 6025.

1. **Patents ⊂⊃328—989,927, for process for obtaining naptha from natural gas, invalid for want of invention.**

   The Saybolt patent, No. 989,927, claims 1 and 2, for a process of obtaining naptha from natural gas by subjecting the gas under pressure to an absorbing menstruum while on its way to the consumer, *held* invalid for want of invention, in view of the prior art.

2. **Patents ⊂⊃7—Applying old process of obtaining liquids from gas to obtaining of gasoline from natural gas not invention.**

   Where it was known that gas contained gasoline in substantial quantities, and that volatile hydrocarbons could be obtained from gases by causing them to pass through an absorbent oil, and that the amount of gas dissolved by a liquid was proportionate to the pressure to which the gas was subjected, there was no invention, but only the application of an old process to a new use, in utilizing the pressure under which natural gas is necessarily transported to cause the absorption of gasoline therefrom by an absorbent menstruum.

3. **Patents ⊂⊃7—When process patent covers both dry and wet gas, the process cannot be limited to dry gas.**

   Where a patent for a process for obtaining naptha from natural gas covers both wet and dry gas, the patented process cannot be restricted to dry gas, though in practice used in the treatment of dry gas.

4. **Patents ⊂⊃175—Use of tank shown in drawings, but not made essential by claims, held optional.**

   Where a patentee of a process for obtaining naptha from natural gas made no claim that a vent tank shown in the drawings was necessary, and it was not specifically made an essential step of the process defined in the claims, its use is optional.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Patents** ⬥27(1)—**Application of well-known devices and processes to new uses in analogous arts not invention.**

It is not a patentable invention to apply old and well-known devices and processes to new uses in other analogous arts.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Suit by the Standard Oil Company and another against the Oklahoma Natural Gas Company. From a decree dismissing the bill, complainants appeal. Affirmed.

Marshall A. Christy, of Pittsburgh, Pa., and Livingston Gifford, of New York City (Bayard H. Christy, of Pittsburgh, Pa., on the brief), for appellants.

George A. Prevost, of Washington, D. C., and Frederick P. Fish, of Boston, Mass., for appellee.

Before CARLAND and LEWIS, Circuit Judges, and MUNGER, District Judge.

CARLAND, Circuit Judge. [1] This is an appeal from a decree dismissing appellants' bill, which charged appellee with infringement of letters patent No. 989,927, to George M. Saybolt, dated April 11, 1911, for obtaining naptha from natural gas. The application for the patent was filed September 1, 1906. On August 31, 1906, Saybolt assigned all his rights in said application to appellant Standard Oil Company, to which the patent was issued as assignee. The other appellant, Hope Natural Gas Company, is the exclusive licensee under said letters patent. There is no question of title or infringement. The only question is the validity of the patent. The trial court adjudged claims 1 and 2 of the patent void for want of novelty and patentable invention. The patent has three claims, but no infringement is shown as to claim 3, and it will not be considered. Claims 1 and 2 read as follows:

"1. The process of obtaining naptha from combustible gas of natural origin and underground source of the kind supplied by means of wells and pipe lines to cities for consumption therein, which process consists in subjecting such gas in the requisite large amount on the way from its underground sources to its places of consumption and under a high pressure, not less than about thirty pounds to the square inch above atmospheric pressure, to a naptha absorbing menstruum, and by the aid of the same under said high pressure effecting the separation in industrial quantity from said gas of a natural gas naptha liquid at atmospheric pressure and temperature and applicable to the uses of petroleum naptha of similar volatility, substantially as described.

"2. The process of obtaining naptha from combustible gas of natural origin and underground source of the kind supplied by means of wells and pipe lines to cities for consumption therein, which process consists in subjecting such gas in the requisite large amount on the way from its underground sources to its places of consumption and under a high pressure, not less than about thirty pounds to the square inch above atmospheric pressure, to a naptha absorbing menstruum, especially petroleum or hydrocarbon oil as specified, and by the aid of the same under said high pressure effecting the separation in industrial quantity from said gas of a natural gas naptha liquid at atmospheric pressure and temperature and applicable to the uses

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of petroleum naptha of similar volatility, and then recovering the naptha in liquid form from said menstruum by distillation under a low pressure, not more than about atmospheric pressure, substantially as described."

The specifications which relate to the patent in suit, so far as is necessary to the present discussion, read as follows:

"This invention relates to the obtainment of naptha from combustible gas of natural origin and underground source, which gas is obtainable by means of wells sunk into the ground to the proper horizon, and is capable of use as fuel. Natural gas wells sometimes do and sometimes do not yield oil also. In oil-yielding gas wells (or to state the matter conversely, in gas-yielding oil wells) the natural gas may rise with the oil, or a separation between them may take place underground. From the wells the gas is piped to the places of consumption, which may be longer or shorter distances away. This natural gas is and long has been obtained and used in enormous quantities. One single well, for example, has been known to yield 36,000,000 of cubic feet of gas in 24 consecutive hours. While therefore, the naptha exists in the gas in the form of vapors under small tension and consequently in an attenuated condition, and while it composes only a small proportion of the gas, at least ordinarily, the amount varying in the gas from different wells, yet in the aggregate a large quantity of naptha is daily burned as fuel, along with those combustible constituents of natural gas (hereinafter referred to as the lighter combustible constituents of the gas), which are gaseous at atmospheric pressure and temperature. Naptha is volatile; but it is liquid at atmospheric pressure and temperature, say 15 pounds to the square inch and 60 degrees Fahrenheit, or thereabout. It may be defined generally as including all hydrocarbons, and each of them, which are liquid at atmospheric pressure and temperature, and which have lower boiling points than the normal hydrocarbons of burning oil (kerosene). It exists in vapor form in natural gas by reason of its association with the other constituents thereof.

"There exists, and for some years back has existed, a great demand for naptha. It is mainly obtained from petroleum; and the crude oils from fields developed in recent years contain it in less proportion than does Pennsylvania oil. It is therefore, and for some years has been, highly important to enlarge the available supply of naptha. The present invention has this object in view. In accordance with this invention, natural gas, as defined above, is subjected to an absorbent menstruum; by the aid of this menstruum a separation is effected of the naptha from the lighter combustible constituents of the natural gas; and the absorbed naptha is afterward separated from the menstruum and is recovered apart therefrom in the form of a liquid product."

Naptha is a comprehensive term, embracing light oils in general, and as used in the patent means gasoline. The process of the patent involves the application of physical laws, as distinguished from the laws of chemistry, and no chemical reactions, so far as known, take place in the practice of the patented process. A very interesting discussion is found in the brief of counsel for appellants as to the chemistry of hydrocarbons, and this discussion is answered in the brief of counsel for appellee. These discussions, however, are not only confusing, but they have no relevancy to the validity of the patent, as no chemical reaction is shown in the claims and specifications, or in the practice of the patent. The physical laws involved in the practice of the patent read: (a) Subjecting natural gas under a pressure (not less than 30 pounds per square inch) to a naptha absorbing menstruum (an oil heavier than gasoline), to enable the heavier oil to absorb from the gas the gasoline vapors carried by the gas. (b) The distillation of

the menstruum or heavy oil containing the absorbed gasoline to drive off the gasoline vapors, which are then cooled and condensed and recovered in liquid form.

[2] Counsel for appellee claim that the Saybolt process is only a plain application of a pre-existing method of obtaining other liquid hydrocarbons from other gases produced artificially in the destructive distillation of coal and so-called shale, a defense generally termed double use. Saybolt did not claim in his application for the patent in suit to be the inventor of the recovery by absorption of vapors of normally liquid substances entrained in gas. Upon this point the specifications say:

"Heretofore appliances of many kinds have been devised for bringing gas into contact with other material, with a view of separating one or more of its constituents from the rest of the gas."

[3] This language is broad enough to include the recovery of such substances as benzol and shale naptha from coke oven and shale gas as set forth in the record. It is also admitted that, prior to Saybolt's invention, it was known that wet natural gas (that is, gas sucked up through the casing in the process of pumping oil from oil wells) contained gasoline vapor in substantial quantities; but it is claimed that Saybolt was the first to discover the presence of gasoline in dry gas (that is, gas "supplied by means of wells and pipe lines to cities for consumption therein," and lean casing head gas, being gas from oil wells which has been separated from the oil before reaching the casing head), and that his process for obtaining this gasoline in industrial quantities from dry gas was distinctively novel. As the patent in suit covers both wet and dry gas, we think the contention that the process relates wholly to dry gas rather than wet cannot be maintained. In practice the process is used in the treatment of dry gas. The evidence shows that, prior to the application of Saybolt in 1906, it was known that gasoline was present in dry natural gas. It may be true that before that time the presence of gasoline in dry natural gas in commercial quantities was not known, but Saybolt did nothing to enlighten any one on this matter. There is no evidence that he ever practiced his process before his application or afterwards; hence it cannot be said that Saybolt discovered the presence of gasoline in dry natural gas in commercial quantities. It was not until the appellant Hope Company experimented with the process in 1912 or 1913 that it was found that by the use of the process gasoline could be obtained from dry natural gas in sufficient quantities to be commercially profitable, if the price of gasoline was high enough.

Moreover, we fail to comprehend how the quantity of gasoline to be obtained from dry natural gas can be credited to the patented process. The amount of gasoline to be obtained necessarily would depend upon the amount of gasoline vapor held in the natural gas treated and the pressure at which the gas passed from its underground sources to its places of consumption. Henry's law, known since 1803, states that the amount of gas dissolved by liquid is proportional to the pressure to which the gas is subjected. This same law proves that, the greater the

pressure the absorption is conducted under in the Saybolt process, the more gasoline is absorbed by the absorber menstruum, and the greater the quantity of liquid hydrocarbons finally obtained. The operation of this law was not novel, and could have been predicted without experimentation. It appears from the evidence in the record that the usual pressure of natural gas as it flows from the wells through the pipe lines to the cities for consumption averages 300 pounds per square inch, and that this pressure is fixed by the requirements of the transportation system. That the pressure is not created or fixed for the purpose of extracting the gasoline content of the natural gas by absorption, but is fixed or created for the purpose of maintaining pressure upon the pipe line system that will transport the gas to the distant markets. It further appears from the evidence that the pressure used on natural gas for the purpose of obtaining gasoline by absorption is whatever pressure that exists on the transportation system where the absorption plant is located.

The claims of the patent require the natural gas to be under a pressure of not less than about 30 pounds to the square inch above atmospheric pressure, but Saybolt knew from the law of Henry the function that pressure would perform in the absorption of the gasoline vapor from natural gas. The pressure of the natural gas already existed to the knowledge of every one. If the natural pressure of natural gas as it comes from the wells is not sufficient to properly carry the gas to the cities for consumption, then compressors are used to increase the pressure and force the gas to its destination. Whether the gasoline actually obtained from natural gas can be handled at a profit would depend upon the cost of obtaining it and the price at which it could be sold; the latter depending upon the supply and demand therefor. It satisfactorily appears from the evidence that there was no particular need in the industrial arts for the patented process to produce gasoline from natural gas at the time Saybolt filed his application; the ordinary method of refining being sufficient to supply the demand. At the date of the Saybolt application the production of gasoline was 7,000,000 barrels, being an increase in approximately six years of 314,817 barrels, and the record shows that, if there had been a demand therefor, more gasoline could have been produced by refining, because after 1906, when the automobile industry began to assert itself, a greater amount of refined gasoline was produced than before. In 1880 the price of gasoline was $1.65 per barrel, in 1890 $1.81 per barrel, in 1900 $2.39 per barrel, in 1905 $3.08 per barrel—an increase from 1880, covering a period of 25 years, of $1.27 per barrel. The record also shows that in 1905 only 85,000 automobiles propelled by gasoline motors were being used, while in 1910 there were 400,000 in use. The Hope Company did not put the patented process into operation until July, 1913, after a period of 7 years and 10 months from the date of Saybolt's application, when the number of automobiles had increased to 1,010,483, and gasoline had reached the price of $4.29 per barrel. These facts greatly impair the force of the statement in the specifications that:

"There exists and for some years back has existed a great demand for naptha."

From the facts stated we do not think it can be claimed that Saybolt established any new industry, because prior to his application gasoline was being produced by the ordinary method of refining sufficient for all industrial needs, and it was not until over 7 years after the application, when automobiles driven by gasoline motors increased in great numbers, that the demand for gasoline became such as to make gasoline obtained by absorption commercially profitable. The idea of obtaining gasoline from natural gas under pressure was not new, as the natural gas which Saybolt described was always under either natural or artificial pressure on its way to the cities for consumption, and the pressure only affected the quantity of gasoline produced, which fact was well known. The proceedings of the Patent Office which resulted in the allowance of the Saybolt claims throw light on the question at issue. The record shows that Saybolt's application, as originally filed, had 32 claims, 16 for the apparatus and 16 for process. Claim 1 of the process claims, as originally filed, is a sample of the other process claims, and reads as follows:

"The process of obtaining naptha from combustible gas of natural origin and underground source, consisting in subjecting such gas to an absorbent menstruum and in effecting by the aid of such menstruum a separation of natural gas naptha from the main body of the lighter combustible constituents of the gas, substantially as described."

On October 8, 1906, the Patent Office called for a division of the process and apparatus claims and also stated:

"As indicating the state of the art, and as showing that the invention under consideration is obviously a mere double use of an old process and of an old apparatus, reference is made to Lunge, Coal Tar and Ammonia, London, 1889, pp. 33–36."

October 4, 1907, Saybolt's attorney amended such claims by inserting:

"On the way from its said underground source to its place of consumption."

With this amendment the attorney filed an argument combating the claim that the process was a mere double use and obvious to one skilled in the art. On November 11, 1907, the Patent Office wrote the attorney and stated:

"An examination of the above passages shows a recognition of the fact that the hydrocarbons, condensing at ordinary temperatures, but not so stable as kerosene, the very substances classified as 'naptha' by the applicant, are present in natural gas. The relation of these substances to natural gas is thus known to be quite analogous to the relation of benzol to the ordinary illuminating gas, since in each case a substance of a much higher boiling point is 'dissolved' in the gas. In view of this, it seems clear that no invention would be required to apply to the removal of 'naptha' from natural gas the same method and apparatus as are employed to remove the benzol or 'naptha' from illuminating gas. A method and apparatus, substantially the same as applicant's are disclosed in the references already cited from Lunge, and in the following German patents. * * * The claims are rejected."

On November 4, 1908, the attorney filed an amendment, by which he modified the specifications slightly, and added 4 claims, 2 for the process and 2 for the apparatus. With this amendment an argument was filed, attempting to distinguish natural gas and its naptha from coal gas and its naptha. On November 30, 1908, the Examiner of the Patent Office answered the attorney by saying:

"There does not seem to be any patentable matter in the claims presented previously to the latest amendment, in view of the references of record, nor in those last presented, in view of the German patent to Kunow, of record, which describes a method involving the 'pools' of the applicant. * * * All the claims are rejected."

On November 26, 1909, Saybolt amended his original specifications, canceled all of the claims, and substituted 12 new claims, 6 process and 6 apparatus; claims 4, 5, and 6 of the group being the same as claims 1, 2, and 3, of the patent, and having in them the requirement that the absorption be carried on under at least 30 pounds pressure. The Patent Office allowed claims 4, 5, and 6, and rejected all other claims on the references and reasons of record. On January 14, 1910, Saybolt amended some of his claims, but not 4, 5, and 6, canceled one claim, and filed another argument, in which he again combated the Examiner's position that applicant's process was a mere double use and obvious to one skilled in the art. On February 11, 1910, the Examiner took the following action:

"This case has been reconsidered, in view of the amendment of January 14, 1910. The merits of this case having been fully considered, final action is now taken. Claims 4, 5, and 6 may be allowed; the others are finally rejected."

September 2, 1910, applicant canceled all claims but 4, 5, and 6, which he renumbered 1, 2, and 3, and these claims were allowed. This record shows that the patent was finally allowed on the three claims mentioned, because they contained the words "under a high pressure not less than about 30 pounds to the square inch above atmospheric pressure." We have heretofore shown that Saybolt had nothing whatever to do with applying pressure to the natural gas, but simply took the gas at high pressure in the lines as he found it, and that in a gas-transportation system a high pressure is used for transportation purposes solely. We do not think that the language above quoted distinguished Saybolt's claims from the prior art, especially when we consider that he had nothing whatever to do with the pressure which existed prior to his entrance into the field.

Counsel for appellants admit that everybody knows that moisture can be absorbed from air by causing it to pass through a hydroscopic substance, and that it was old in the production of coke by the destructive distillation of coal to treat the gaseous products of the distillation to obtain their contents of tar and ammonia, and finally to cause the cleaned residual gas to percolate through an absorbent oil, and thus obtain from the gas its substantial vapor content of benzol and toluol, which belong to a group of unsaturated hydrocarbons called aromatics; these gases being subsequently recovered from the oil by distillation. This operation is described in the Lunge publication, London,

1887, referred to by the Patent Office in the first rejection of the Say-bolt claims. The operation, or what is known as the absorption process, has also been practiced in this country since the year 1889 by the Semet-Solvay Company at Syracuse, N. Y., for the recovery of light oil from coke oven gas in the same manner as that described by Lunge. It is also admitted that essentially the same operation has been carried on for more than 100 years in the so-called shale oil industry in Scotland; the light liquid product in that case belonging mainly to another group of unsaturated hydrocarbons called olefine. The shale oil industry is treated of historically in the book by I. I. Redwood, published in London in 1897. The prior art relied upon by the appellee to show complete anticipation of claims 1 and 2 of the patent, and which was not cited or considered by the Patent Office in connection with the Saybolt application, are as follows: Young-British Patent No. 3,137 of 1875; Redwood publication, Mineral Oil and Other By-Products, published 1897; A. S. Cooper article, Pacific Oil Reporter, October 14, 1905; A. S. Cooper article, Petroleum Gazette, Titusville, Pa., Dec., 1905; Semet-Solvay Co., Benzol Recovery Plant, 1898. The second and fourth claims of the Young patent are as follows:

"Absorbing and recovering the volatile hydrocarbons from gases resulting from the coking and charring of coal, wood, and similar substances at high temperatures, by causing the oils to circulate through an apparatus, wherein after absorbing the vapors from the gases the whole or part of the oils are subjected to complete or partial distillation, and caused to part or partially part with the hydrocarbons absorbed, so that the oils may be returned to the absorbing vessel again in a fit state to take up fresh quantities of hydrocarbon vapors, substantially as hereinbefore described and shown in the accompanying drawings."

"The recovery of the volatile hydrocarbons from gases resulting from the destructive distillation of coal, shale, and similar bituminous substances, and from the coking or charring of coal, wood, and similar substances at high temperatures, by compressing such gases in the presence of an oil capable of absorbing the suspended vapors of the hydrocarbons, and cooling the absorbent oils by the action of the expanded gases thereon, substantially in the new or improved manner hereinbefore described and shown on sheet 2 of the drawings hereunto annexed."

The title of the Young patent is "Improvements in Obtaining Hydrocarbon Vapors from Gases, and in the Apparatus Employed Therefor." The object of the invention is stated as follows:

"My said invention has for its object the more perfect removal and collecting of those hydrocarbons diffused through the gases produced in obtaining mineral oils from coal, shale, peat, and analogous bituminous substances, as well as in the processes of coking coal, peat, or charring wood."

The record shows that coal, shale, petroleum, and natural gas are analogous bituminous substances. The Young patent describes a process which, so far as we are able to discover, is for all practical purposes the same as the Saybolt process, and in this connection it must be borne in mind that we are dealing with a process and not an apparatus. Counsel for appellants seek to distinguish the old absorption process from the Saybolt process by showing the differences in the relations of the vapors desired to be recovered from coke oven gas and shale gas

and those to be recovered from natural gas. If the process is the same, we fail to understand how the composition of coke oven and shale gas and the composition of natural gas affects the question to be determined in any way. The process recovers the vapors whatever their composition, and even if there be a difference in the composition, Saybolt was simply applying the old process to a new use, which was not invention. The element of pressure is also a part of the process described by Young. In his specifications Young says:

"In place of using so large a quantity of water as is required by the preceding processes to cool the large volume of denuded oils and also to condense the necessarily large volume of steam carried over from the still with the vapors of the absorbed hydrocarbons, and at the same time to more perfectly separate the vapors from the gases, the previously described arrangement is so modified that the gases and heavy oils are brought into intimate contact under pressure. This is accomplished by making the coke compartment sufficiently strong, and pumping the gases and oils through it, the denuded gases being allowed to escape into the outlet pipe by a weighted safety valve, or their expansive force may be economically used to assist in pumping a fresh portion of saturated gas and oil into the coke compartment, which oil may also be cooled by the gas so expanded, the saturated oils being drawn off at the bottom by a regulated ball cock. By these means the quantity of oil requiring to be put through the arrangement is comparatively small, as the oil is capable of absorbing out of the gas a much larger quantity of the vapors whilst under pressure, and the supersaturated oils on being allowed to escape into the still part with the absorbed hydrocarbons much more easily, and as less steam passes over with them there is required a comparatively small quantity of water to condense the vapors and cool the denuded oils.

"The amount of pressure to which the gases are subjected may be varied according to circumstances; from one to three or four atmospheres will generally be found sufficient, but the pressure in a great measure depends upon the nature and quantity of the absorbent oil employed, and the boiling points of the hydrocarbons to be recovered from the gases; the greater the absorbent power of the oil the larger the quantity employed, and the higher the boiling point of the hydrocarbon to be recovered from the gas the lower may be the pressure; on the other hand, when the oil has a low absorbing power, when the quantity employed is small, or when the hydrocarbon to be recovered from the gas has a very low boiling point, the pressure must be increased."

The record shows also from the testimony of the witness Biddison that a "Young" plant was constructed and operated at Homer, Ohio, from the teachings of the Young patent, and that gasoline was produced from the natural gas treated by the plant; that this plant demonstrated that the absorption process under pressure set forth in the Young British patent, and the apparatus disclosed by Young could be bodily adopted for the treatment of natural gas. The witness Burrell testified that the absorption process and apparatus set forth in the Redwood publication was an apparatus and process covering all the essential details having to do with the absorption of naptha from gas. The Redwood publication refers to the Young British patent and describes the absorption process as disclosed by Young without the use of pressure and also stated that gas and heavy oil might be brought into contact under pressure. The witness Blauvelt, who had been in the employ of the Semet-Solvay Company at Syracuse, N. Y., testified in substance that coal gas produced by the distillation of coal in the

ovens after being cooled and scrubbed to remove the tar and ammonia was and is treated by the old absorption process for the recovery of light hydrocarbon oil, commonly known as crude benzol, the vapors of which are carried in the coal gas; the gas being taken from a pipe line for transportation to cities for distribution and consumption therein. In the A. S. Cooper article, found in the Pacific Oil Reporter dated October 14, 1905, it was stated that the absorption process could be applied to natural gas for the extraction of the light oil vapors therefrom. Cooper stated:

"Natural gas can be deprived of light hydrocarbons suspended and contained in the gas as a vapor by passing the gas through heavy liquid petroleum oil, which boils at a high temperature; the heavy liquid hydrocarbon being an absorbent of the light hydrocarbon vapors. After being absorbed, the light hydrocarbons are separated from the heavy liquid petroleum oil by distillation."

[4] It is claimed by counsel for appellants that the vent tank shown in the drawings of the patent in suit is a vital element in the apparatus for carrying out the absorption process, but Saybolt made no claim that the vent tank was necessary, and counsel for appellants state in their brief:

"The step of preliminary distillation in the vent tank * * * is not specifically made an essential step of the process defined in the patent claims."

We therefore think the use of the vent tank is optional. Appellants rely upon the cases of Naylor v. Alsop, 168 Fed. 911, 94 C. C. A. 315, and Badische v. Kalle (C. C.) 94 Fed. 163, in support of the claim that Saybolt made a patentable discovery. In the Naylor Case the use of gaseous nitrogen peroxide for bleaching flour was involved. The patent was sustained because the inventor had not used known agents in the art of bleaching flour, but the only agent that had yet been found to accomplish that result successfully. The Badische patent was for a new soluble indigo dye, obtained by persistent and prolonged washing of a material thought to be insoluble. An ordinary amount of washing would not render the material soluble. The result reached by prolonged washing, therefore, was unexpected, as was the result in the Naylor Case. No one had tried prolonged washing before, and the result obtainable from such washing was unknown. The difference in the facts of these cases and the one at bar prevent them from ruling this case. Spill v. Celluloid Mfg. Co. Case (C. C.) 21 Fed. 631, also cited by appellants, would seem to support the claim of appellee. See Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327, where the Spill Case is cited with approval.

[5] In an opinion of reasonable length it would be impossible to follow counsel as to all points discussed orally and in brief. We are satisfied that Saybolt discovered nothing new; that he simply applied an old and well-known process to a new use, which produced no new result or an old result in a better or easier way. It is not a patentable invention to apply old and well-known devices and processes to new uses in other and analogous arts. Lovell Mfg. Co. v. Cary, 147 U. S.

623, 13 Sup. Ct. 472, 37 L. Ed. 307; Penn. R. Co. v. Locomotive E. S. Truck Co., 110 U. S. 490–494, 4 Sup. Ct. 220, 28 L. Ed. 222; Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Heald v. Rice, 104 U. S. 737, 26 L. Ed. 910; Atlantic Works v. Brady, 107 U. S. 192, 199, 2 Sup. Ct. 225, 27 L. Ed. 438; Blake v. San Francisco, 113 U. S. 679, 5 Sup. Ct. 692, 28 L. Ed. 1070; Thatcher v. Burtis, 121 U. S. 286, 7 Sup. Ct. 1034, 30 L. Ed. 942; Aron v. Manhattan R. Co., 132 U. S. 84, 90, 10 Sup. Ct. 24, 33 L. Ed. 272; Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 495, 20 Sup. Ct. 708, 44 L. Ed. 856; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U. S. 426, 38 Sup. Ct. 547, 62 L. Ed. 1196; Werk v. Parker, 249 U. S. 130, 39 Sup. Ct. 197, 63 L. Ed. 514.

Decree affirmed.