## CARBIDE & CARBON CHEMICALS CORPORATION v. TEXAS CO.

District Court, S. D. Texas, at Houston. August 4, 1927.

No. 271.

**1. Words and phrases—"Weathering" of natural gas to produce commercial gasoline is merely separating by evaporation a sufficient quantity of highly volatile constituents to reduce vapor tension of remaining liquid mixture to desired figure.**

"Weathering" of natural gas to produce commercial gasoline is merely separating off by evaporation a sufficient quantity of the highly volatile constituents to reduce the vapor tension of the remaining liquid mixture to the desired figure.

**2. Words and phrases—"Natural gas" is a mixture of a number of different hydrocarbons.**

"Natural gas," whatever its source, is a mixture of a number of different hydrocarbons.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Natural Gas.]

**3. Patents ⟨=⟩36(2)—Commercial success is considered only in case of doubtful validity.**

Commercial success is not to be considered in determining validity of patent, except in cases of doubtful validity, and then in view of the condition of the trade, as well as the art.

**4. Patents ⬅17(1)—Changing proportions of constituents of composition already well known is not "invention."**

Changing the proportions of the constituents of a composition already well known does not constitute "invention."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

**5. Patents ⬅328—No. 1,465,598, for process of treating mixtures of hydrocarbons, held void for anticipation.**

De Brey patent, No. 1,465,598, for process of treating mixtures of hydrocarbons, *held* void for anticipation.

**6. Patents ⬅328—Nos. 1,429,175 and 1,523,- 314, relating to natural gas gasoline, both process and product, held void for anticipation.**

Thompson patents, No. 1,429,175, for process of treating natural gas to produce natural gasoline and for the product and No. 1,523,314, for a natural gas gasoline as a new product, *held* void for anticipation in the art.

In Equity. Suit by the Carbide & Carbon Chemicals Corporation against the Texas Company. Decree for defendant.

Mayer, Warfield & Watson, of New York City, and Andrews, Streetman, Logue & Mobley, of Houston, Tex., for plaintiff.

Frederick P. Fish, of Boston, Mass., Merrell E. Clark, of New York City, Brady Cole, of Houston, Tex., R. J. Dearborn, of New York City, and Daniel Stryker, of Brooklyn, N. Y., for defendant.

HUTCHESON, District Judge. This is a suit asserting the validity of three United States patents, Nos. 1,465,598, 1,429,175, and 1,523,314, charging defendant with infringement of them, asking an injunction against further infringement, and an accounting for profits from past infringement.

The first numbered patent, No. 1,465,598, was issued to · De Brey, a foreign patentee, upon an application filed June 1, 1918, entitled for improvements in a "process for the treating of hydrocarbons," and, as stated by plaintiff in its brief, "this patent was acquired by plaintiff after its issuance, and upon discovery that it contained dominating claims which would otherwise have been infringed by plaintiff under the Thompson patents."

The Thompson patents, No. 1,429,175 and No. 1,523,314, were issued on applications filed, respectively, August 29, 1921, and May 31, 1923, to Thompson, an employee of plaintiff.

Infringement is alleged of claims 1, 3, 5, 9, and 10 of De Brey and claims 2 and 3 of the first Thompson, all process claims, and of claims 7, 8, and 9 of the first Thompson, and 1, 2, 3, 4, 5, and 6, second Thompson, all product claims. See appendix, this opinion.

While all of the De Brey claims, except No. 3, cover broadly mixtures of hydrocarbons, the infringement claimed is connected with the manufacture of natural gas gasoline, and the real insistence of the plaintiff as to its process claims is that they have to do· with improvements in the treatment of those hydrocarbons with which the natural gas gasoline art is concerned; that these improvements are directed to increasing the yield of gasoline, while holding the product within the range of permitted volatility, or, putting it another way, to increasing the yield of marketable gasoline while at the same time preserving the product from inadmissible "wildness."

As to most, if not all, the process claims, and as to most of the product claims, I think infringement is clear, and around the validity of these claims the real contest revolves; for if there are any of the claims so narrowly phrased, and to be so narrowly construed as that defendant's operations will not infringe them, these are of such minor importance and so restricted as to be practically unimportant here, while the claims that are infringed are of the greatest importance, not only to plaintiff and defendant, but to those generally engaged in the manufacture of natural gasoline, and it is to these broader claims, undoubtedly infringed, if valid, that I shall devote this opinion.

Natural gasoline, the material about which this controversy rages, is gasoline extracted from natural gas. There are two sources from which natural gas is derived: First, from wells which yield only natural gas; and, second, from producing or exhausted oil wells.

The end, sought in the production of natural gasoline from natural gas · is a liquid gasoline product, consisting of hydrocarbons taken from the natural gas, and having a designated volatility or vapor tension. This is accomplished usually in two successive steps. In the first or extraction step, a separation is made between the highly volatile and the less volatile constituents of the natural gas, the latter forming a liquid product known as raw gasoline, which has too high a vapor tension, or, as the expression goes, is too "wild" for safe transportation and use. This extraction is usually carried out in a compression or absorption plant.

The second step consists in reducing to the desired figure the vapor tension or volatility of the raw gasoline, which has been ex-

tracted from the natural gas by the first step. The patents in suit have to do with the second step, the treatment of raw gasoline to reduce its vapor tension.

The natural gasoline industry sprang up in connection with the oil industry, "as a kind of mushroom industry." At first the only natural gasoline was that which automatically condensed under atmospheric pressure and temperature conditions at the point of collection. Later the compression method was introduced to increase the natural yield, and during this period it was only with gases of the greatest richness in gasoline component that the industry concerned itself. Still later the absorption method came into standard use for treating lean gases, while the compression method was used for treating rich gases. By the use of these methods a gross product was obtained which was unmarketable without further treatment, to get rid of the more volatile constituents, so that the gasoline would be both safe to handle and would not continually lose by evaporation.

Since the inception of the natural gasoline industry the most common methods for accomplishing this have been weathering and blending, and sometimes the two methods have been combined. Blending involves merely the mixing with the raw natural gasoline of petroleum naphtha of relatively low volatility, so as to produce a mixture having a volatility or vapor tension lower than that of the original raw gasoline. Weathering has a more important bearing upon the issues of this case than has blending.

[1] Weathering means merely separating off, by simple evaporation, a sufficient quantity of the highly volatile constituents to reduce the vapor tension of the remaining liquid mixture to the desired figure, and, while simple evaporation is a very inexpensive method compared with blending, it is a very wasteful method, because of the excessive losses. Its efficacy was increased by the use of closed tanks, instead of open ones, and by sending the vapors from the top of these tanks back to the inlet of the compression or absorption system, where they mingled with the incoming natural gas.

In recent years the increasing demand for motor fuel has stimulated the production of gasoline of all kinds. As a result there has been a tendency to place the natural gasoline producing plants on a more efficient operating basis, and this development finally opened the door to the introduction, as a substitute for weathering, of the use of distillation apparatus, the well-known rectifying column. It is the process of employing the rectifying column, and the products produced from this process, which is the subject-matter of this suit—plaintiff contending that the claims of the patents in suit evidence inventions of great magnitude and importance; the defendant contending that what is represented by the patents is merely the well-known process of rectification, the essential characteristic of which is that it makes possible a closer separation between constituents of different volatility than can be accomplished by the use of the simple still. That weathering tanks were simply stills, and that the application of rectification to this industry is precisely the same, and came in precisely the same way that it has done in other industries, not through invention, but because, commercially, the time had arrived when, notwithstanding the expense of installing and operating, it is profitable to use.

In addition to this brief history of the industry, something should be said of the physical and chemical characteristics of the product itself, and as to that it may be briefly said:

[2] Natural gas, whatever its source, is a mixture of a number of different hydrocarbons, each one having a definite chemical composition, or, in other words, a definite number of hydrogen and carbon atoms to the molecule; for example, methane, one of these hydrocarbons, has a chemical formula, $CH_4$, one carbon and four hydrogen atoms; hexane, $C_6H_{14}$, six carbon and fourteen hydrogen atoms.

The natural gas and gasoline hydrocarbons mainly referred to at the trial, and their boiling points, are as follows:

| | | | | | |
|---|---|---|---|---|---|
| Methane | −160 deg. C., | or | −256 deg. F. |
| Ethane | −90 " " " | −130 " " |
| Propane | −45 " " " | −49 " " |
| Butane | +1 " " " | +34 " " |
| Pentane | +35 " " " | +95 " " |
| Hexane | +65 " " " | +149 " " |

The objects of weathering and of rectification are precisely the same, to get rid of the hydrocarbons whose volatility is either dangerous or wasteful. The object of blending is roughly to make a composition which by a kind of absorption will strike an average between the high and low volatility of the components, thus producing a stable and therefore marketable, blend.

That gas is composed of the hydrocarbons mentioned above was known to chemists and to many persons in the industry, but no methods of analysis were provided in the actual industry for the purpose of determining the hydrocarbons excluded from or remaining in the gasoline, and in producing gaso-

line it was the physical characteristic of volatility, and not the chemical composition of the molecules entering into the final product, which was considered.

The importance of the chemical characteristics of natural gas, and the knowledge of and control over the combination and separation of its molecules, bulks very largely in the testimony in this case—plaintiff asserting that it is one of the controlling features in considering the validity of the patents; defendant, that it has no bearing on them. It is unquestioned, however, on both sides, that a physical characteristic of natural gas, volatility, the ability or tendency to vaporize or volatilize, is of very great importance—the defendant claiming it is the only thing of importance to be known or considered in connection with the handling and manufacture of natural gas; plaintiff claiming that it is merely an incident or symptom of chemical conditions, the knowledge and control of which in the invention, if it does not form, certainly proves, the merit of the Thompson discovery.

Of volatility it might be briefly said that a material, such as a hydrocarbon, which boils at a relatively low temperature, is highly volatile; a material which has a high boiling point is said to have low volatility. The volatilities of the hydrocarbons present in natural gas cover a wide range. Some of them are so volatile that it is virtually impossible to liquefy them; others, though normally gases, have been liquefied by cooling them under suitable pressure; and others, when isolated, are normally liquid.

These normally liquid hydrocarbons are carried along with the normally gaseous ones in the natural gas. They tend to make the natural gas wet, but it is still, to all appearances, a gas. Just as the natural gas may contain normally liquid hydrocarbons, so, also, may a liquid mixture of hydrocarbons contain, dissolved in it, some normally gaseous hydrocarbons.

The volatility of a hydrocarbon mixture —that is, the tendency of the mixture to give off vapors—depends upon the relative proportions of the hydrocarbons which it contains. In the natural gasoline industry, the volatility of liquid mixtures is usually spoken of in terms of vapor tension, which is determined by empirical tests.

While, as I have before said, chemists and persons versed in the industry knew of the chemical constituents of gas, and while some industries, notably the Atlantic Refining Company, as to pentane, have been for years separating hydrocarbons, and many patents have been issued treating of the separation of the hydrocarbons, Snelling particularly having set down in his patent the chemical constituents of natural gas by their names, and having taught how they could be precisely and sharply separated by rectification, to the practical in the industry it was a case of "the primrose by the river's brim," and to the operator natural gasoline natural gasoline was to him, and it was nothing more. It was either wild or tame, or partly wild and partly tame; its body was hydrocarbon, largely pentane and higher; and, while it always contained some propane and some butane, nobody bothered to find out just how much of either there was in it.

When the required vapor tension was achieved, it was marketable gasoline, and there is no doubt that the proportion of propane and butane in the production always varied greatly in accordance with the atmosphere and other conditions, and that the final product, especially in the case of blended products, often contained large quantities of butane.

There is evidence which not only appears reasonable, but which I think almost inevitably correct, when you consider the nature of the material of which the product was made, and the methods used to make it, of gasoline having been produced before Thompson of the same vapor tension and Baume gravity as that which Thompson claims to have discovered, and there is evidence which for the same reasons, not only appears credible, but almost certainly true, that by simply weathering to-day at the Burkburnett plant gasoline can be and is produced having a high butane content, as high, in fact, as any of the products claimed by Thompson, except perhaps No. 5 and No. 6.

Now the practical question is presented here: In such an industry, so beginning and so continuing, with such a product so constituted and so treated, can it be said that Thompson invented a gasoline with the chemical composition and vapor tension described by him, which is a product so new over the prior experience as to entitle him to a patent which will effectually prevent others from making it? And can it be said that he or De Brey have invented a process which entitles them to protection, by the mere application, as their patents call for it, of rectification to natural gas?

Plaintiff opens its argument by laying down as its first line of defense the undoubted proposition that the fundamental rule, governing the construction of a patent and

each of its parts, requires that it be liberally interpreted in favor of the patentee, and that the granting of the patent is prima facie evidence of its validity, citing Robinson on Patents, vol. 2, p. 383; Minneapolis, St. P. & S. M. R. Co. v. Barnett (C. C. A.) 257 F. 302.

Further entrenching itself, and as a second line of defense for the validity of its patents, plaintiff emphasizes the undoubted utility of the practices referred to in them, the avidity with which defendant and others have seized upon these practices, since their disclosure, and the pertinacity with which they hold on to them; and it invokes Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Smith v. Peck (C. C. A.) 262 F. 415; Acme Foundry & Mch. Co. v. Oil Well Imp. Co. (C. C. A.) 2 F.(2d) 530; Howe Mch. Co. v. Coffield (C. C. A.) 197 F. 541; Southern Electro-Chem. Co. v. E. I. Dupont (C. C. A. Third Circuit) 20 F. (2d) 197.

Further entrenching itself, and as a last line of defense, it says that the De Brey patent should be considered as a genus patent, covering generally the application of rectification of the kind described by De Brey to the art, and in no manner anticipated by any prior disclosure, while the Thompson patents evidence an advance upon De Brey, in that they exhibit a discovery of the importance of the interrelation and correlation of certain control factors not disclosed by De Brey, which enables operators under the process claims of Thompson's patent to produce a more definite and satisfactory product than De Brey, and a greater yield of that product; while they say that the product claims of Thompson's first patent cover a material, not disclosed by De Brey or the prior art, of such a character and composition, and so different from what was known to the industry, as to entitle it to patent protection, while those of the second Thompson carry the disclosure of the first the last step farther, producing a material still different from and in advance of that described in the first Thompson.

To these positions defendant replies that plaintiff's first line is the one taken by every patentee; that it is merely a statement of a principle that the court should not lightly destroy a patent, because a patent is property. They say, however, that, just as a patent to land gives the patentee prima facie title, so the patent to an invention gives the patentee title; that just as a patent to land, if the field notes cover land already appropriated, will fail, so a patent to an invention will fail, if it covers anticipated matter, which they say the patents in suit plainly do. [3] As to the second line of defense, they say that the question of commercial success does not have any pertinency in the case for the reason that a plea of this character is never considered unless some real doubt exists in regard to the validity of the patent, citing Huebner Toledo v. Mathews (C. C. A.) 253 F. 435, where the court said: "Commercial success is never a safe criterion of invention, except in cases of doubtful validity of the patent." They cite, also, Standard Oil Co. v. Oklahoma Natural Gas Co. (C. C. A.) 284 F. 469, and they also say, upon the facts, that plaintiff has at the present time installed its stabilizers in only 29 out of the 1,100 natural gasoline plants in this country; that the old methods are still being used, and will continue to be used to some extent; that, instead of a revolution, there is here merely an evolution; that here is exactly the same character of taking over of practices used in reference to other hydrocarbons, just as the natural gasoline industry took over the oil-absorption system of the benzol and shale oil industries. Standard Oil Co. v. Oklahoma Natural Gas Co. (C. C. A.) 284 F. 469. They say that the Carbide people, plaintiffs, seeing that in the natural course of the business a sharper separation would be necessary, rushed into the Patent Office and had patents issued on rectification, and they then laid in wait for the day which must surely come.

They say that for six years the Dutch Shell group, who owned the De Brey patent, did nothing to put the ideas of De Brey into practice. They say that for three years the Carbide people did not, apart from the small plant at Clendennin, W. Va., reduce their idea to commercial practice; that plaintiff should be given the same answer to their claims that was given Saybolt in the Standard Oil Co. Case; that such commercial success as has been obtained by plaintiff's "stabilizers" has been due to the excellent sales methods employed in offering manufacturers the stabilizers with the promises of large returns; in short, that the so-called commercial success has been so small, so belated, and so accounted for by the natural development of the industry, as to deprive this point of any value—citing Peoria Target Co. v. Cleveland Target Co. (C. C.) 47 F. 725, where it is said, "The speedy and general adoption by the public of a patented device is not conclusive on the question of novelty and utility, where it can be accounted for on

grounds peculiar to the course of trade;" and Kurtz v. Belle Hat Lining Co. (C. C. A.) 280 F. 277 where it is said, "It has been well said that 'in determining this question it is proper to bear in mind the condition of the trade, as well as the art to which the patent in suit is allied.'"

[4] Meeting plaintiff's third and last line of defense, defendant says that the product claims of both the Thompson patents are invalid; that Thompson has invented no new product; that the product claims do not describe a new composition, but merely have to do with differences in proportion which are not patentable—citing Railway v. Rowley, 155 U. S. 621, 15 S. Ct. 224, 39 L. Ed. 284, Brady Brass Co. v. Ajax (C. C. A.) 160 F. 84; Belais v. Goldsmith (C. C. A.) 10 F. (2d) 673; Bituminous Products v. Headley (D. C.) 2 F.(2d) 83, where the court said: "The new product must differ from the old, otherwise than in degree. To support a patent, the new characteristics of the proposition must be other than, or not confined to the mere augmentation or diminution of the known characteristics of the several ingredients which is in correlation with the increased or diminished amount of the respective ingredients entering into the composition."

They say, further, that the product claims are invalid, because they were anticipated by Snelling, who taught precise separation of individual hydrocarbons, and therefore the making of a product with any particular composition of hydrocarbons which the user of his patent desired to produce; and specifically they say that as to the first patent the product claims were anticipated by De Brey, and as to the second patent anticipated by the disclosures of both the Thompson first patent and De Brey; and they finally say that there is no evidence to show that these are new products, but that, on the contrary, the evidence not only shows that gasoline of this character was and had been made, but it shows that the inevitable result of the application, to material such as that at Burkburnett, of any good rectification would produce precisely the product that Thompson claims, and that by weathering the same result can easily be obtained.

As to the process claims, defendant says that as to De Brey his effort, except in connection with claim No. 3, is to obtain a monopoly of the whole field of rectification of hydrocarbons, and that, as to claim No. 3, he does not suggest any particular or new method of rectification; he merely applies any good rectification; that this, however, has been done for many years with various kinds of hydrocarbons, including natural gas.

They say the only thing that De Brey did was to set down what is obvious; that the application of rectification to hydrocarbons found in natural gas would produce the sharp separation desired to increase the quantity of gasoline within the range of permissible volatility, without the necessity of blending, and in a better way than by weathering, and therefore all the art, and especially Schill and Woidich in the gasoline art, have anticipated him. They say that the process claims of the first Thompson, while limited to natural gas, were anticipated, not only by others in the prior art cited, but specifically by De Brey, because his process was so broadly stated and covered so wide a field as that one, with the De Brey patent before him, could set out to form a liquid of predetermined vapor tension from a mixture of natural gas hydrocarbons by the use of a good rectifier, and, if the predetermined liquid was the Thompson product, he would inevitably produce it.

They say that Thompson merely formularized in attractive terms and clothed in popular phraseology certain facts thoroughly known to all chemists, and that to the chemical and physical phenomena which are well known to all scientific men and most practical men in the gas industry he gave a sales set-up, and with the aid of plaintiff's sales and mechanical force produced an attractive sales proposition; that, if there can be invention in so stating chemical formulas and mechanical problems as to popularize their use, here is invention, but that the Patent Office grants no patent for that.

They say that, if there can be invention in demonstrating by experimentation, what every chemist already knows, that the volatility of a mass of hydrocarbons is increased greatly by the presence in that mass of some very volatile constituents, and that the volatility of the whole can be greatly decreased out of proportion to the mass excluded, by excluding the most volatile constituent, then he has invented; but that this is not invention. They say it is immaterial to the gasoline industry what the constituents of natural gasoline are named, or whether there is included in it by name butane, propane, or hexane; that it is of the highest importance to produce gasoline of a certain volatility and vapor tension, and as much gasoline as can be produced within the limits of admitted volatility; and that when the industry, in the course of its evolution, has reached the point where rectification became desirable, it

ought not to be permitted to any one to exclude others from the field merely by first using an obvious or well-known device.

Plaintiff replies that defendant is undertaking to give too broad a scope to the De Brey patent; that it does not claim a patent upon rectification generally, but upon the specific art described in the patent, and that none of the prior art in any way anticipates it; that certainly, as limited to the natural gas industry, it ought to be protected as evidencing invention, to the extent, at least, of introducing into the art practices never before employed in or conceived of as beneficially applicable to it; that none of the prior art, including Schill and Woidich, at all anticipated De Brey, nor, they say, did De Brey anticipate Thompson.

On page 17 of their brief they discuss De Brey's improvement:

"Reverting now to the De Brey patent, it is to be considered from two points of view: First, what does it disclose as the inventor's contribution toward advancing the art? and, second, what does it fail to disclose, or, in other words, how much of the advance contributed to the art by plaintiff under the three patents in suit collectively remains attributable to the inventions of Thompson in addition to and beyond the invention of De Brey?

"The De Brey patent affords a clear answer to both questions. As to the first point, it is indisputable that De Brey first directed the art to the practice of the process which included rectification of the excessively volatile gross condensate resulting from gasoline extraction by the compression or absorption method, for the purpose of improving the net yield by reducing weathering losses, and for the purpose of standardizing the product independently of climatic conditions, and independently of blending. On the second point, De Brey's disclosure stopped absolutely short of any instruction or suggestion to the art with respect to the composition of final product in terms of individual hydrocarbons or in terms of any correlation between chemical composition and physical characteristics of final product.

"De Brey accepted for the application of his improved process the step of extracting its gasoline content from the natural gas by compression or absorption common to the art at his date; but he operatively associated with this step the sequential step of rectification in place of weathering to produce, so far as the patent remotely suggests, substantially the same old product, but in greater amount, than had theretofore been possible; in other words, the new process of De Brey yielded an old product in greater amount and in a better and more economical way. Such an achievement, under the decisions, constitutes patentable invention."

As to Thompson's contribution, they say that what Thompson did was to go in the face of accumulated experience, which had taught that butane was an objectionable hydrocarbon ingredient of gasoline, and devise a new method and produce a new product, which centered on the very inclusion of the hydrocarbon butane in the final stabilized gasoline, the definite and volitional process by which propane was to be excluded, and as much butane as possible included in the final product, and the products thus achieved constitute, according to plaintiff, the Thompson claims; and while it is stated in various forms and argued from various angles, this is plaintiff's answer to the defendant on Thompson's position—*that others had thought butane harmful; others had not realized that excluding propane would enable butane to be included; that Thompson realized and found this out, and that this is his invention.*

Much of the trial was devoted to a discussion of the constituents of gas, the processes of rectification and distillation, and the difficulty or ease of making a sharp separation in various stated instances; but, when the testimony was through, I think the case came down, after allowing due weight to all these matters, to the simple proposition that here is a case of rectification, pure and simple, where the ingredient which De Brey calls worthless is represented in Thompson's patent by propane; the product which De Brey calls valuable is represented in Thompson by the normal constituents of natural gasoline, pentane and higher, and more or less butane. In short, the case which to a nontechnical man like myself, looking on, appeared in the statement of it profoundly complex, at the end of it, to the same nontechnical man, thanks to the ability and candor of the technical witnesses, appears profoundly simple.

[5, 6] Upon the case as made I have no difficulty in agreeing in the main with the defendant, and while, on account of the undoubted value of rectification to the industry, I have had some difficulty in rejecting entirely the process claims, and have struggled unavailingly to find some limiting statement in them which will give plaintiff some, though narrow, protection, the product claims have from the beginning seemed to me, and still do seem, fundamentally non-

patentable, and I am at a loss to know how the Patent Office could have granted a patent for natural gasoline as a new product, merely because, for instance, as one of the claims shows, the patented gasoline contains more butane than petroleum gasoline; or how the Patent Office could have granted a patent for a natural gas gasoline merely because it contained more butane than some others might have contained.

Nothing is disclosed, at best, for the patentee in this product, but a difference of degree between the constituents of it and all prior products. There is no new product whatever created. There is merely a sharp separation of the chemical constituents of the gas, and a sharp discarding of some of them. This is nothing more than doing the same thing in a better and more exact way than by weathering, and in accordance with the well-known and established principles of rectification known for many years in this and kindred arts.

Besides, I agree with defendant that substantially this product has been, can be, and will be made again by weathering, and if by weathering gasoline has been produced with a substantial quantity of butane in it, it is no more a new invention to produce gasoline with 25 per cent. butane, as against 10 or 18 per cent. before, than to produce a saline solution of 15 per cent., following a common practice of 10 per cent.

In addition, I think it clear that the product claims of the second Thompson patent are anticipated by the disclosures of both De Brey and the first Thompson patent and are but the necessary result of those disclosures if a good rectification is employed with a definite object in view, and certainly it could not be successfully contended that the owner of a patent for a process could be deprived of the right to employ the process by a later patent taken out for the product of that process.

In what I have said about the product claims, I would not be understood as belittling plaintiff's position. So earnest has been its insistence, and so ably has its side been maintained, that I would be wanting both in good manners and in good sense, if what I have said has given the impression that these claims have been disposed of cavalierly.

It has seemed to me from the very beginning, and increasingly so as I have studied the record in the light of the briefs, that plaintiff has added greatly to the burdens assumed by it when it had to sustain the De Brey process claims without invalidating the Thompson process claims, when it undertook to carry the matter still further, and in the product claims press for a monopoly upon natural gas gasoline merely on the ground of the complete exclusion from it of one of its most volatile constituents, and the inclusion in it of a considerable quantity of that next in volatility.

As to the process claims, plaintiff has found itself in a position of great difficulty. Most of De Brey is so broad as to be clearly anticipated, while at the same time it carries sufficient disclosure with sufficient definiteness, directed to the material and the art with which the Thompson patents concern themselves, to operate to destroy him, and I think that the greater part of the difficulty in this case, both in its development in the evidence and its presentation to me, has sprung out of the fact that the three patents overlap each other, and cover in many respects substantially the same ground.

Turning specifically to the consideration of the process claims of De Brey, I agree with defendant that all of them, except No. 3, are so broad in their claims as to seek to cover the rectification of hydrocarbons generally, and are anticipated in the various patents in suit covering rectification; that claim No. 3 is less broad than the other claims, in that it is limited to natural gas gasoline, but that he does not suggest any particular or new method of rectification which involves invention; that he merely suggests applying good rectification to the natural gasoline industry; that such a suggestion is not patentable, because anticipated generally by the prior art, and specifically by Schill and Woidich; that the only thing he did was to suggest, what was obvious to any mechanic and any chemist, that the application of rectification to the hydrocarbons found in natural gasoline would produce the sharp separation desired to increase the quantity of gasoline within the range of permitted volatility, and therefore all the art, and Schill and Woidich in the gasoline art, had anticipated him.

I also agree with them that the process claims of the first Thompson are anticipated, not only by De Brey, but by Schill and Woidich, Snelling, and other citations in the prior art.

Finding as I do, that all the patent claims are invalid, let a decree be entered, dismissing plaintiff's bill for want of equity.

### Appendix.

1,465,598, De Brey; filed June 1, 1918; dated August 21, 1923:

1. The process of treating mixtures of hydrocarbons containing a valuable liquid and a worthless gaseous component which comprises

rectifying the mixture at a low temperature and at a superatmospheric pressure less than 20 atmospheres and correlating the pressure and the temperature range of rectification in such manner that the maximum temperature is sufficient to expel all the worthless component from the valuable component while the minimum temperature is sufficient to condense a portion of the worthless component whereby the last fractions of valuable component are washed out of the gaseous worthless component by the liquefied worthless portion thus condensed.

3. A process as claimed in claim 1 in which casing head gasoline is treated.

5. Process for splitting mixtures of hydrocarbons of different volatility into two components, namely, into a valuable liquid component practically free from gases, the recovery of which in liquid state is not wanted, and into a gaseous component practically free from those fractions of minor volatility which are to be recovered in liquid state, which process consists in subjecting the mixtures of hydrocarbons to rectification at such pressure and within such corresponding limits of temperature, that the most volatile components during the whole process of rectification are kept partly in gaseous and partly in liquid state.

9. Process as claimed in claim 1, in which the low temperatures necessary for rectification are produced by the expansion of the compressed hydrocarbon-mixture.

10. Process as claimed in claim 1, in which the low temperatures necessary for rectification are produced by the combined action of the expansion of the compressed hydrocarbon-mixture and a cooling agent.

1,429,175, Thompson 1; filed August 29, 1921; dated September 12, 1922:

2. Process of forming a liquid of predetermined vapor pressure from a mixture of natural gas hydrocarbons, which comprises separating from the mixture a fraction having a higher vapor pressure than that desired in the final product, introducing said fraction into a rectifying column at a point intermediate its top and bottom, separating the fraction by rectification into a liquid portion and a vaporous portion, withdrawing said vaporous portion at the top of the column, compressing at least a part of the portion thus withdrawn, and expanding the same into the rectifying column.

3. Process of forming a liquid of predetermined vapor pressure from a mixture of natural gas hydrocarbons, which comprises separating from the mixture a fraction having a higher vapor pressure than that desired in the final product, and rectifying the said fraction to produce therefrom a vaporous portion and a liquid portion, the rectification being so conducted that not more than one hydrocarbon of said fraction will occur in substantial quantity in both the vaporous and liquid portions.

7. As a new material, a liquid having the characteristic composition and boiling curve of a natural gas gasoline, containing more butane than petroleum gasolines, and being free from propane.

8. A natural gas gasoline having a density not less than 87° Bé. and a vapor tension not substantially greater than 12 pounds at 100° F.

9. As a new composition, a liquid such as can be prepared by the hereindescribed process comprising removing from wild natural gas gasoline a vaporous fraction by means of a rectification treatment so conducted that not more than one hydrocarbon occurs in substantial quantity in both the fraction removed and the residue.

1,523,314, Thompson 2, filed May 10, 1924; dated January 13, 1925; original filed May 31, 1923:

1. As a new product, propane-free natural gas gasoline, containing upward of 25 per cent. of butane.

2. As a new product, natural gas gasoline containing upward of 25 per cent. of butane and having a vapor pressure not substantially in excess of 18 pounds per square inch at 100° F.

3. As a new product, natural gas gasoline containing upward of 25 per cent. of butane and free from more volatile hydrocarbons.

4. As a new product, natural gas gasoline containing upward of 25 per cent. of butane and free from more volatile hydrocarbons, and having a vapor pressure not substantially in excess of 18 pounds per square inch at 100° F.

5. As a new product, natural gas gasoline containing upward of 40 per cent. of butane and free from more volatile hydrocarbons.

6. As a new product, natural gas gasoline containing upward of 40 per cent. of butane and having a vapor pressure not substantially in excess of 18 pounds per square inch at 100° F.